NOT DESIGNATED FOR PUBLICATION

No. 117,398

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

DAMION K. LOONEY,
*Appellant*.


MEMORANDUM OPINION

Appeal from Sedgwick District Court; JEFFREY SYRIOS, judge. Opinion filed July 20, 2018. Affirmed in part, reversed in part, sentence vacated, and remanded with directions.

*Christina M. Kerls*, of Kansas Appellate Defender Office, for appellant.

*Lesley A. Isherwood*, assistant district attorney, *Marc Bennett*, district attorney, *Derek Schmidt*, attorney general, for appellee.


Before ARNOLD-BURGER, C.J., POWELL and GARDNER, JJ.


PER CURIAM: Damion K. Looney appeals from a jury verdict finding him guilty of criminal discharge of a firearm, criminal possession of a firearm, reckless aggravated battery, and two counts of aggravated assault. We agree that Looney's convictions for criminal possession of a firearm and for aggravated assault of Wells were improper, and that Looney must be resentenced. But we otherwise affirm.

1

*Factual and procedural background*

After receiving some bad news, Damion Looney and his fiancé Breeanna Connell went to a Wichita bar. By the end of the night, each had taken at least ten shots of vodka. While there, Connell met up with some of her friends, including Quinton Edwards, Sean O'Neil, Christian Wells, and David McCoy. After an incident in which Looney used mace in the bar, bouncers kicked Looney out of the bar. Connell followed Looney, intending to leave with him because he had her purse and phone in his truck, and so he would not be upset. But the bouncers would not let Connell leave with Looney because they saw him behaving aggressively and ramming his truck at the wall. Looney left. He later testified that he wished Connell had gone with him because he had her things and did not know how she was going to get home.

Some of Connell's friends invited her to go with them to a different bar, and she did so. She later called Looney and told him that she would not be coming home that night. Upon hearing this, Looney became upset and got a gun out of his truck with the intention of shooting himself. He testified that he had the gun to his head but at the last second pulled the gun away and shot the couch instead. Looney tried calling Connell several times, but he could not get ahold of her.

While they were out, Connell asked McCoy, Edwards, O'Neil, and Wells to take her home because she was concerned about Looney. Although they were worried about the situation, her friends agreed and drove her home. The parties' testimony varies as to what happened after they dropped Connell off at her home. We summarize the testimony below.

2

*Connell's version of events*

When Connell got back to the house, she went inside and grabbed a container of cottage cheese from the refrigerator. As she walked into the living room, she heard a gunshot. As Connell went to ask Looney why he was using guns and mace, Looney backed her onto the couch, holding the gun between her eyes. Connell slammed the container of cottage cheese into Looney's face, grabbed her phone, and ran outside to call her friends to come back and pick her up. Looney followed her outside and tackled her to the ground. While they were outside, Connell's friends showed up. Edwards and McCoy approached Connell and Looney, walking calmly with their hands in the air. Connell was screaming and warned them that Looney was dangerous and had a gun. Eventually, they helped Connell get into their car.

Connell and Edwards decided to return to the house to retrieve Connell's dog. When they were walking up to the house, Edwards saw Looney walking around to the front of the house, still brandishing his gun. Once they were inside, Edwards locked the door so that Looney could not come in and took Connell to the basement for her safety. Looney was yelling and unsuccessfully tried to kick in the door. Looney turned to McCoy, who was also outside the front door, pointed the gun at him, and told him that he would shoot him if he did not get the door open. When McCoy was unsuccessful at opening the front door, Looney hit him in the forehead with the nose of the gun.

After realizing that neither the front nor the side door would open, Looney noticed Wells and O'Neil waiting in the vehicle parked on the street. Looney approached the vehicle and pointed the gun at Wells. O'Neil was on the phone with law enforcement. Looney told them that if anyone called the police, he would shoot everyone. He turned to O'Neil and told him that he better not be contacting the police, still threatening to shoot. Looney then ran back toward the house. A bleeding McCoy ran to the vehicle, told them to leave the area, and then ran back toward the house. O'Neil and Wells heard a gunshot

3

as they were pulling away. O'Neill remained on the phone with 911 dispatch, narrating what he saw and heard.

Looney made it to the side of the house right when Edwards was at the top of the stairs. Looney yelled for Connell to get out of the house and then fired shots into the house. A shot hit Edwards in the back of the head, and he fell backwards down the stairs. Connell heard someone at the door, ran upstairs, and saw McCoy, who called the police. Edwards survived but has significant long-term effects of his injuries.

*Looney's version of events*

According to Looney, about an hour after he almost attempted suicide, he saw a car pull up outside his house, and Connell got out. When Connell entered the house, she and Looney began arguing. Looney told Connell how upset he had been and that he had shot the couch instead of himself, but Connell did not believe him. Looney pointed out that Connell had come home without her engagement ring on. Connell asked for her phone and went outside, and Looney went into the bathroom and cried.

When Connell came back in the house, the door opened behind her and Edwards ran into the house and grabbed her, picking her up and carrying her out the front door. Looney grabbed his gun and ran after them. Looney saw Edwards trying to put Connell in his car, heard Edwards yell for her to get in the car, and heard Connell yell that she was not going. Looney testified that he was terrified. He screamed and ran toward Connell as she broke loose of Edwards. Connell then ran into the house, with Edwards and McCoy running behind her. Looney pulled out his gun, pointed it at Edwards and McCoy, and told them to leave.

Connell was also yelling at the men to leave, but Edwards came through the front door and entered the house. Looney pointed the gun at Edwards and told him to get out,

but McCoy grabbed Looney from behind, pinning Looney's arms to his side. Looney fired two shots into the floor to scare McCoy, hoping McCoy would let him go. Instead, Edwards and McCoy dragged Looney out of the house and locked the front door. Looney could hear Connell screaming from inside and could see that she was on the floor. He tried to kick in the door.

McCoy ended up outside the house with Looney. The two got into a fight, and Looney put the gun to McCoy's head and threatened to shoot him. Instead of shooting him, Looney hit McCoy on the head with the gun. After the scuffle, Looney ran to the side of the house, looked through the door, and saw Connell being dragged down the stairs. When he saw someone coming up the stairs, Looney shot through the side door. Not aiming at anyone or anything in particular, he shot as an instinctive reaction to having seen Connell being dragged down the stairs without making a sound. After shooting, Looney saw Edwards with a bloody face, bleeding from the head.

Looney ran away, put the gun in a tree, spent the night in an alley, and was found the next day by police.

Looney was tried on one count of criminal discharge of a firearm, three counts of aggravated battery, two counts of aggravated assault, and one count of criminal possession of a firearm. The jury found Looney guilty of criminal discharge of a firearm, reckless aggravated battery of Edwards, both aggravated assault counts, and criminal possession of a firearm. The jury found him not guilty of the aggravated batteries of McCoy and Connell. The district court sentenced Looney to 239 months in prison, to run consecutive to a 12 month jail term. Looney appeals.

*Was Looney's Texas deferred adjudication properly considered a prior conviction in Kansas?*

We first address Looney's contention that the district court erred in treating his deferred adjudication from Texas as a conviction in Kansas. First, he argues that the deferred adjudication cannot satisfy the prior felony requirement of his criminal possession of a firearm charge. Second, he argues that the district court improperly classified his prior deferred adjudication as a felony when calculating his criminal history score. We agree on both counts.

*Analysis*

The underlying facts of the Texas proceeding are not in dispute. Looney pleaded guilty to aggravated assault with a deadly weapon in Travis County, Texas. The Texas district court found a sufficient factual basis for Looney's guilty plea, but the court never entered a judgment or adjudication of guilt. The Texas district court stated, "the Court [is] of the opinion that the best interests of society and the defendant will be served in this cause by deferring further proceedings without entering an adjudication of guilt pursuant to Article 41.12, Section 5 of the code of Criminal Procedure." Looney received a deferred judgment with conditions and was placed on Community Supervision for 10 years.

Whether Kansas can consider the deferred adjudication a conviction depends on how we interpret a Kansas statute. Interpretation of a statute is a question of law over which we have unlimited review. *State v. Collins*, 303 Kan. 472, 473-74, 362 P.3d 1098 (2015). The State argues that the plain language of K.S.A. 2017 Supp. 21-5111(d) says that a conviction includes the acceptance of a guilty plea. But the section provides that the Kansas definition of conviction "includes a judgment of guilt entered upon a plea of

6

guilty." K.S.A. 2017 Supp. 21-5111(d). The State's argument about the statutory language is therefore unconvincing, as it leaves out the judgment of guilt requirement.

The Kansas Supreme Court has recently reaffirmed that a judgment of guilt is necessary to meet the statutory definition of a conviction. In *State v. Hankins*, 304 Kan. 226, 372 P.3d 1124 (2016), the defendant pleaded guilty to an offense and received a deferred judgment in Oklahoma. He completed the procedure in accordance with Oklahoma law, resulting in a discharge without a judgment of guilt. After being charged with several felonies in Kansas, the defendant claimed that the court used an incorrect criminal history score because it had included the deferred judgment from Oklahoma as a prior conviction. The Kansas Supreme Court held that the defendant's sentence was illegal, holding that the Oklahoma deferred conviction could not be considered a conviction in Kansas because the Oklahoma court had never entered a judgment of guilt as required in K.S.A. 21-5111(d). 304 Kan. at 233-34.

Although *Hankins* is factually distinguishable from our case, as the defendant there had completed his probationary period and Looney had not, that difference is not vital to *Hankins*' holding that an entry of guilt is necessary for a prior adjudication to be considered a conviction in Kansas. 304 Kan. at 235, 238. We are bound by the Kansas Supreme Court's holding that "under Kansas law, the entry of a judgment of guilt by the foreign court is necessary to meet this State's definition of a conviction." 304 Kan. at 238. Establishing a factual basis for a guilty plea is necessary, but insufficient for this purpose. 304 Kan. at 236. We cannot consider Looney's Texas deferred adjudication, which had no judgment of guilt entered against him, to be a conviction in Kansas.

This error affects Looney's case in two ways. First, it negates an element of his criminal possession of a firearm charge. K.S.A. 2017 Supp. 21-6304 criminalizes the possession of a firearm by a person who has been convicted of a felony in Kansas or in another jurisdiction. The criminal possession of a firearm by a convicted felon is defined

7

as possession of a weapon by a person who within the preceding 10 years has been convicted of aggravated assault with a deadly weapon. K.S.A. 2017 Supp. 21-6304(a)(3)(A). The State alleged that Looney violated this statute by unlawfully possessing a handgun when he had been convicted of a felony within the previous 10 years, and relied on Looney's Texas deferred adjudication as that underlying felony. But because no entry of a judgment of guilt has been shown, Looney's Texas deferred adjudication cannot meet the Kansas definition of a conviction. Thus, the State cannot prove the required elements of this felon in possession statute. As a result, the district court erred in denying Looney's motion to dismiss the criminal possession of a firearm charge, and we must reverse this conviction.

Second, this error affects Looney's criminal history score. "[T]he sentencing guidelines for criminal defendants [from the Kansas Sentencing Guidelines Act] are generally based upon two factors:  the crime severity ranking of the current crime of conviction and the criminal history classification of the defendant." *State v. Neel*, 292 Kan. 625, 630-31, 258 P.3d 365 (2011); K.S.A. 2017 Supp. 21-6803, 6804. Kansas courts use all prior felony convictions to determine an offender's criminal history classification, including an offender's out of state convictions and juvenile adjudications. K.S.A. 2017 Supp. 21-6811(e). The district court counted Looney's Texas deferred adjudication as a prior conviction. But because Looney's deferred adjudication does not meet the Kansas definition for a conviction, we cannot use his deferred adjudication in calculating his criminal history score. We must remand for resentencing.

*Does sufficient evidence support Looney's conviction of aggravated assault of Christian Wells?*

We next consider Looney's argument that the State did not present sufficient evidence of aggravated assault of Wells because it failed to prove Wells had any apprehension of immediate bodily harm. Again, we agree.

8

*Standard of review*

When evaluating whether a conviction is supported by sufficient evidence, we review all the evidence in the light most favorable to the State. We will uphold the conviction if we are convinced that a rational fact-finder could have found the defendant guilty beyond a reasonable doubt based on that evidence. *State v. Laborde*, 303 Kan. 1, 6, 360 P.3d 1080 (2015). In determining whether sufficient evidence supports a conviction, we will not reweigh the evidence or the credibility of witnesses. *State v. Daws*, 303 Kan. 785, 789, 368 P.3d 1074 (2016).

*Analysis*

The aggravated assault charge was based on the following event. On the night of the incident, Wells was driving the car, O'Neil was in the passenger seat, and McCoy and Edwards were inside the house with Connell. Wells was parked in front of Looney's house when Looney ran up to the car with his gun. Looney held the gun up to Wells' head or chest and told him to drive away. He continued yelling at Wells and O'Neil, threatening to shoot them if they called the police and did not leave. Looney then returned to the house. After McCoy came out of the house and told them to leave, Wells drove away.

To sustain a conviction for this aggravated assault, the State had to prove that Looney used a deadly weapon to knowingly place Wells in reasonable apprehension of immediate bodily harm. K.S.A. 2017 Supp. 21-5412(b)(1). "[A]ggravated assault is based on both a subjective apprehension by the victim, i.e., whether the victim had an apprehension of immediate bodily harm, as well as an objective determination that the apprehension was reasonable." *State v. Angle*, No. 116,152, 2017 WL 4216161, at *3 (Kan. App. 2017) (unpublished opinion), *rev. denied* 307 Kan. 988 (2018). Both are necessary. Since the legislature added the reasonableness requirement, our courts have

9

addressed the objective reasonableness of a victim's fear. See *State v. Bulk*, No. 114,462, 2016 WL 7494359, at *5-6 (Kan. App. 2016) (unpublished opinion), *rev. denied* 306 Kan. 1321 (2017). But the statute continues to require a subjective fear as well. Without some evidence that the victim had a subjective apprehension of imminent bodily harm, the court cannot determine whether that apprehension was reasonable.

We find no evidence that Wells subjectively apprehended imminent bodily harm, either through his testimony about how he felt or through his actions during and immediately following the incident. Instead, Wells testified that he was not afraid that Looney was going to shoot him, and he did not testify that he feared any other type of injury. The State acknowledges that Wells' testimony shows no apprehension of imminent bodily harm.

The State argues, instead, that the jury could reasonably infer that a victim had the necessary fear by the victim's actions and reactions at the scene. *State v. Lessley*, 271 Kan. 780, 790, 26 P.3d 620 (2001). This is a valid legal proposition, but the facts do not support its application here. Wells did not drive away when Looney approached the vehicle brandishing his weapon, when Looney threatened to shoot the passenger, or even when Looney returned to the house. Instead, Wells did not drive away until after Looney returned to the house and McCoy came out and told them to leave. Then, when Wells did drive away, O'Neil testified that he did so "very slowly." Wells' acts do not reflect that he feared imminent bodily harm.

This is not a case in which a victim denies feeling afraid, but his or her actions contradict that testimony. See *Lessley*, 271 Kan. at 788; *State v. Carrell*, No. 101,176, 2010 WL 2545637, at *4-5 (Kan. App. 2010) (unpublished opinion). Instead, this case is most like *State v. Warbritton*, 215 Kan. 534, 527 P.2d 1050 (1974), in which the victim denied that she was afraid, denied that she thought the defendant would harm her, and showed no indication of fear. The Kansas Supreme Court held:  "In the face of positive

10

testimony such as this we cannot say, as urged by the district attorney, that the circumstances were such that, as a matter of law, [the victim] had fear for herself." 215 Kan. at 538. The same is true here.

Because insufficient evidence supports Looney's conviction of aggravated assault of Wells, we must reverse that conviction.

*Did the district court err by not instructing the jury on self-defense for the charges of aggravated assault?*

Looney claims that the district court erred by failing to instruct the jury on self-defense for the charges of aggravated assault. The incident underlying these charges occurred when Looney ran to the car and threatened O'Neil and Wells with a gun, as discussed above.

At most trials, a self-defense or defense of others instruction is not tied to specific charges. But here it was. Instruction 20 told the jury that Looney raises "use of force in defense of a person as a defense." Instruction 21 told the jury that Looney claims "his use of force was permitted as the defense of Breeanna Connell in count two, and as self-defense in count three," and then explained the defense. Count II charged aggravated battery of Edwards, and Count III charged aggravated battery of McCoy. Thus the instructions limited the jury's consideration of this defense to the aggravated battery charges.

*Standard of review*

We follow a three step process when analyzing jury instruction issues. First, we determine if Looney preserved this issue for review. Second, we determine whether error

11

occurred. Third, we determine whether any error was harmless. *State v. Pfannenstiel*, 302 Kan. 747, 752, 357 P.3d 877 (2015).

*Analysis*

    *Aggravated assault charges*

Looney argues that the district court erred in denying his request to instruct the jury on self-defense for the aggravated assault charges. This issue is properly preserved, as Looney requested the self-defense instruction on this charge and objected when the district court declined to give it.

We thus determine whether the instruction would have been legally and factually appropriate. An instruction is legally appropriate when the instruction fairly and accurately states the applicable law. When determining whether an instruction is legally appropriate, our review is unlimited. *State v. Plummer*, 295 Kan. 156, 161, 283 P.3d 202 (2012). An instruction is factually appropriate when sufficient evidence, viewed in the light most favorable to the requesting party, supports a factual basis for the instruction. In this analysis, we do not reweigh the evidence or redetermine issues of credibility. 295 Kan. at 161-62.

A defendant is entitled to an instruction on an affirmative defense that is supported by competent evidence. Competent evidence is that which could allow a rational fact-finder reasonably to conclude that the defense applies. K.S.A. 2017 Supp. 21-5108(c). The right to use force in self-defense is codified in K.S.A. 2017 Supp. 21-5222(a):

    "(a) A person is justified in the use of force against another when and to the extent it appears to such person and such person reasonably believes that such use of

12

force is necessary to defend such person or a third person against such other's imminent use of unlawful force."

This statute presents a two-pronged self-defense test. The first test is subjective and requires a showing that the defendant sincerely and honestly believed it was necessary to kill to defend himself. *State v. McCullough*, 293 Kan. 970, 975, 270 P.3d 1142 (2012). A defendant's own assertions may be enough to establish this factor. *State v. Walters*, 284 Kan. 1, 9, 159 P.3d 174 (2007). The second prong is objective and requires a showing that a reasonable person in the defendant's circumstances would have perceived the use of deadly force in self-defense as necessary. *McCullough*, 293 Kan. at 975.

Even if Looney could meet the subjective prong of this test by virtue of his own assertions, he cannot meet its objective prong—a reasonable person in Looney's circumstances would not have thought deadly force was necessary to defend himself from Wells or O'Neil's imminent use of unlawful force. Looney's assertion that he went out to the car with a loaded weapon because he thought the two men in the car posed additional threats to him, is not reasonable. Nothing shows that Wells or O'Neil used unlawful force, were armed, threatened to harm Looney, or intended to enter Looney's house. The two men never left the car or approached the house. Although Wells and O'Neil were associated with McCoy and Edwards, neither had interacted with Looney whatsoever before he ran up to their car armed with a gun. And once Looney got to the car, he seemed to initiate the conflict rather than react in self-defense. He threatened Wells and O'Neil at gunpoint to leave and warned them he would shoot them if they contacted law enforcement. A reasonable person in Looney's circumstances would likely not have believed it necessary to grab a weapon and run to a car containing two unarmed and relatively uninvolved men.

13

A self-defense instruction was not factually appropriate. Thus, the district court did not err in refusing to give a self-defense instruction with respect to the aggravated assault charges.

*Did the district court commit clear error by not instructing the jury on defense of others for the criminal discharge of a firearm charge?*

Looney also contends that the district court committed reversible error by failing to instruct the jury on the defense of others for the criminal discharge of a firearm charge. That statute defines unlawful discharge of a firearm as "the reckless discharge of a firearm within or into the corporate limits of any city." K.S.A. 2017 Supp. 21-6308a(a). But the statute then provides that the prohibition does not apply if "[t]he firearm is discharged in the lawful defense of one's person, another person or one's property." K.S.A. 2017 Supp. 21-6308a(b)(1). Looney claims that he discharged his firearm into his house in the city limits in lawful defense of Connell. Thus, the jury had to consider this defense in relation to this charge.

But Looney did not request this instruction at trial. Because Looney brings this claim for the first time on appeal, he must show that clear error occurred without the instruction. K.S.A. 2017 Supp. 22-3414(3). To establish clear error, "'the defendant must firmly convince the appellate court that the giving of the instruction would have made a difference in the verdict.' [Citation omitted.]" *State v. Cooper*, 303 Kan. 764, 771, 366 P.3d 232 (2016).

*Analysis*

Even assuming that giving this instruction would have been factually and legally appropriate, we find that Looney cannot show that giving it would have made any difference in the verdict. The criminal discharge of a firearm charge arose from Looney's

14

firing of his gun into his house and shooting Edwards. Although the jury was not instructed on the defense of others as to the criminal discharge of a firearm charge, it was instructed on the defense of others as to the aggravated battery charge involving Edwards, which occurred when Looney shot Edwards, upon discharging his firearm. The jury was not persuaded by that defense. Instead, the jury found Looney guilty of reckless aggravated battery even though it was specifically instructed to consider Looney's defense of others claim as to that charge. We thus have no reason to believe that the jury would have acquitted Looney of reckless discharge of a firearm based on Looney's defense of others claim, had it been permitted to do so. Such a result would have been inconsistent with the jury's rejection of that defense on the charge of aggravated battery of Edwards.

*Did the district court violate Looney's Sixth and Fourteenth Amendment rights by using his criminal history score to increase his sentence?*

Finally, Looney argues that the district court violated his constitutional rights by using his prior criminal history to increase his sentence, citing *Apprendi v. New Jersey*, 530 U.S. 466, 120 S. Ct. 2348, 147 L. Ed. 2d 435 (2000). Looney acknowledges that the Kansas Supreme Court rejected this argument in *State v. Ivory*, 273 Kan. 44, 46-48, 41 P.3d 781 (2002), but he raises the issue to preserve it for federal review.

Our Supreme Court recently reaffirmed *Ivory* in *State v. Scuderi*, 306 Kan. 1267, 1268, 403 P.3d 1206 (2017). We are duty bound to follow Kansas Supreme Court precedent absent some indication that the court is departing from its earlier position. See *State v. Meyer*, 51 Kan. App. 2d 1066, 1072, 360 P.3d 467 (2015). Since there is no indication our Supreme Court is departing from *Ivory*, we conclude that the district court did not violate *Apprendi* in sentencing Looney.

We reverse Looney's convictions for criminal possession of a firearm and for aggravated assault of Wells. We remand for resentencing without consideration of Looney's Texas deferred adjudication for aggravated assault with a deadly weapon. We affirm in all other respects.